**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **8:05CR63** |
| | ) | |
| **MARIO RAMIREZ-BELTRAN,** | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **Defendant.** | ) | |

This case is before the court on the defendant's Motion to Suppress (#11). An evidentiary hearing was held on April 26, 2005. The transcript of the hearing (#22) was filed on May 9, 2005, at which time the motion was deemed submitted.

The defendant, Mario Ramirez-Beltran, moves the court for suppression of evidence obtained from a January 20, 2005 traffic stop on Interstate 80. Defendant alleges that the stop was not based upon reasonable suspicion or probable cause to believe he had committed a crime; that the consent to search the vehicle was not voluntary; and that statements obtained following his arrest were the direct result of the violation of his rights under the Fourth Amendment to the Constitution of the United States. The government objects to the defendant's standing to raise these issues, and further states that if standing exists, a traffic violation provided probable cause for the stop and the totality of the circumstances demonstrate the defendant's consent to the search of the car was voluntarily given.

As discussed herein, I recommend that the motion be denied.

## FACTUAL BACKGROUND

Travis Oetter testified he is a nine-year employee of the City of Omaha, currently serving as a police officer assigned to the canine unit. He has worked the last five years in narcotics investigations where his dog is used for officer safety, building searches, and searching for suspects (5:2-15). On January 20, 2005, while conducting enforcement on Interstate 80, he was parked near the inside shoulder of eastbound Interstate 80 when he observed a red Pontiac pass his location. As he looked at the vehicle's rear plate, Oetter noticed a non-factory license plate bracket and a rear plate; however, he was unable to tell where the plate was from. After leaving his parked position, he caught up to the vehicle and observed a non-factory license plate cover covering the entire name of the issuing state (6:8-17). Oetter positioned his vehicle one or two car lengths behind the Pontiac and observed a cactus displayed on the license plate and, based upon past contacts, determined that the license was an Arizona plate because he was aware Arizona plates had a cactus in the lower lefthand corner (8:5-24).

Oetter testified that because he believed the plate violated a Nebraska law requiring that all letters, numerals and markings on a license plate be clear, visible and readable, he stopped the vehicle (9:6-9). He admitted that at the time of the stop, he was not aware of Arizona law about the display of plates, but he was aware that other states have laws similar to Nebraska (11:15-12:3).

Oetter testified that he pulled the Pontiac over on Interstate 80 and contacted the driver, the sole occupant of the vehicle (12:5-12). The defendant identified himself with what appeared to be a driver's license from Mexico and Oetter determined he did not speak English, but spoke Spanish (12:13-22). As Oetter had taken Spanish in high school and Spanish courses offered by the Omaha police department, he attempted to communicate with the defendant in Spanish (13:1-8). Oetter identified himself as an Omaha police officer and asked the defendant if he spoke English. The defendant stated he did not, so Oetter tried Spanish and informed him of the reasons for the stop (13:9-13). He told the defendant the reason for the stop and asked him to exit the vehicle so he could view the rear license plate and bracket (14:4-11). Oetter showed the defendant the bracket and that the name on the issuing state was completely under the bracket (14:4-11).

Oetter testified his vehicle was equipped with a video camera and that the events of the evening were fairly and accurately recorded (Ex. 3) (14:17-15:18) and that his conversations with 911 dispatch were recorded on an audio recording (Ex. 2) (14:15-15:16).

Oetter testified that when he initially contacted the defendant, he noticed a single key in the vehicle ignition and a flip cell phone flipped open on the passenger seat. The vehicle had a "lived-in look" with miscellaneous trash and Gatorade bottles on the passenger side floor and clothing hanging behind the defendant (16:17-24). He noted that when the defendant gave him the information about the vehicle, that the vehicle was not registered to the defendant. The defendant told him the vehicle was owned by an individual named

-3-

Alejandro; however, when Oetter checked the paperwork Alejandro was not mentioned and an individual named Javier was listed as the owner (17:1-10).

Oetter testified that based upon his training and experience, the absence of the registered owner of the vehicle was significant because in cases involving narcotics, owners try to distance themselves from the vehicle (17:11-16). Oetter also noticed that the vehicle had been recently purchased and had been titled the day before the trip (17:17-19). Based upon his experience in drug cases, individuals change the title from owner to owner to distance themselves from the vehicle (17:20-18:2). Oetter was also concerned about the single key in the ignition, as this is done when a vehicle is only used to transport from point A to point B so there are no house or other types of keys that would be typical on a key ring (18:3-7). He was also concerned about the lived-in look and the shirts in the back window because in drug cases individuals do not leave their vehicle very often and do not take the time to throw away trash, they just want to drive from point A to point B (18:8-13).

Oetter testified that during the stop the defendant was extremely nervous, continually running his hands through his hair, was extremely talkative, laughed at inappropriate times, rapidly chewed his gum, and yawned loudly (18:17-19:3). This behavior was significant to Oetter because he believed it was stress relief (19:3-7). After showing the defendant the license plate, he asked him to come back to the cruiser and go over the remainder of the paperwork. The defendant agreed and was seated in the front passenger seat while Oetter occupied the driver's seat (19:8-15). During his conversation with the defendant in the

cruiser, Oetter asked the defendant for permission to search the car at least a couple of times, and Ramirez stated yes more than once, stating he had no problems with a search (19:16-20:1). The conversation with the defendant in the cruiser was recorded on videotape (20:2-4).

Oetter testified that he filled out a Spanish permission to search form (Ex. 1) before he handed it to the defendant and requested that the defendant read it and if he understood it, to sign it (20:4-19). While Oetter attempted to convey that he wanted the defendant to read the document out loud, he was unable to ask in Spanish, so he motioned to the defendant, who read at least the first sentence out loud (20:22-21:1). The defendant read the rest of the form silently and Oetter watched the defendant's eyes move from side-to-side. The defendant also used a pen Oetter gave him to follow the words on the form as he read (21:21-25). The defendant then signed the form. The defendant asked no questions, but did tell Oetter that he could read Spanish (22:3-8). With the assistance of Officer Charlie Moffit, Oetter searched of the vehicle and under the rear seat recovered two cylinder-type packages wrapped in multiple layers of cellophane.

Oetter testified that during his conversations with the defendant he asked where he was going and the defendant stated he was going to St. Louis to visit his mother and that he was coming from Phoenix, Arizona. This information was significant to Oetter because the defendant was extremely off course (22:24-23:10).

Oetter testified that during his contact with the defendant, he did not make any threats of force or promises (23:21-25).

On cross-examination Oetter testified that when he first observed the vehicle he was parked on the inside of the eastbound shoulder of Interstate 80 (24:6-13). He estimated that the speed of the defendant's vehicle as it passed was approximately 60 miles per hour (25:23-25). He admitted that when he caught up to the vehicle he was able to tell it was registered in Arizona, and he was able to see the license plate numbers (26:10-18). Oetter admitted he saw the cactus in the lower right-hand corner of the plate (Ex. 104) (27:8-16), and that he did not call the plate in prior to pulling the vehicle over (27:22-24). Oetter admitted that he is a canine handler and that his dog was in the vehicle that evening; however, the dog did not take any part in the stop (30:4-13). Oetter admitted that the items he said were possible indicators of criminal activity when taken individually were innocent factors (31:10-14). He also admitted that he had never met the defendant before that day and he was unaware of the defendant's demeanor on a regular day (32:18-25), and he admitted the drugs found under the rear seat were not in plain view (33:20-25).

On redirect examination, Oetter testified that an odor coming from the vehicle was significant because certain odors are used to mask the odor of narcotics, and that while each of the drug activity indicators he observed did not raise suspicion individually; however, when the indicators were combined, his suspicions were raised based on the totality of the circumstances (36:23-37:5).

On recross examination Oetter again admitted that prior to pulling the vehicle over, he was aware the plate on the vehicle was from Arizona and that he could identify all of the numbers on the plate (40:14-21).

## LEGAL ANALYSIS

### A.   Standing

The government contends that defendant lacks standing to contest the search of the vehicle he was driving because the vehicle was registered to another person and the defendant did not show he had valid permission to be in the car at the time it was stopped. Counsel stated during oral argument, however, that the defendant has established a possessory right to the vehicle (45:8-9).

I find that, in light of this "possessory" interest, the defendant had a reasonable expectation of privacy with respect to the vehicle he was actually driving when stopped.[1]

### B.   Validity of Traffic Stop

Defendant argues that Officer Oetter did not have reasonable suspicion to stop his vehicle for a traffic offense pursuant to Neb. Rev. Stat. § 60-324[2] because, since his vehicle

---

[1] The facts of *United States v. Quiroz*, 57 F. Supp. 2d 805, 819-20 (D. Minn. 1999), *aff'd*, 213 F.3d 425 (8th Cir. 2000), cited by the government, are distinguishable. In *Quiroz*, the defendant was found to lack standing to contest the search of a vehicle he had been driving earlier the day, as he presented "no direct evidence that he had any legitimate basis for being in the car." In the case at bar, the defendant was actually driving the vehicle when it was stopped.

[2] Section 60-324 provides, in part:
**Number plates and certificates; to be kept clean; lost or mutilated plates and certificates; replacement; fee.**
  All letters, numbers, printing, writing, and other identification marks upon such plates and certificate shall be kept clear and distinct and free from grease, dust, or other blurring matter, so that

was registered in the State of Arizona, the Nebraska licensing statutes do not apply. *See* Neb. Rev. Stat. § 60-328[3]. Since his license plate complied with Arizona law, *see* Ariz. Rev. Stat. § 28-2354[4], he contends there was no basis to stop him. The court has taken judicial notice of these statutes.

---

they shall be plainly visible at all times during daylight and under artificial light in the nighttime....

[3]Section 60-328 provides, in part:
**Registration; applicability of sections to nonresidents; nonresident licensed vehicles hauling grain or seasonally harvested products; permit; fee; disposition.**
    (1) The provisions of sections 60-301 to 60-326.01 relative to registration and display of registration numbers shall not apply to a motor vehicle owned by a nonresident of this state ... if the owner thereof has complied with the provisions of the law of the foreign country, state, territory, or federal district of his or her residence relative to registration of motor vehicles and the display of registration numbers thereon and conspicuously displays his or her registration numbers as required thereby.
    (2) The provisions of this section shall be operative as to motor vehicles owned by a nonresident of this state ***only to the extent that under the laws of the foreign [state] of his or her residence, like exemptions and privileges are guaranteed to motor vehicles duly registered under the laws of and owned by residents of this state*** ....
\* \* \* \*
(Emphasis added).

[4]Section 28-2354 provides:
**License plates; attachment**
A.  A person shall display the license plate or plates as follows:
    1.  For a motor vehicle, motorcycle, trailer or semitrailer, on the rear.
    2.  For a vehicle for which two license plates are issued, the vehicle owner shall display either of the following:
        (a)   One plate on the rear.
        (b)   One plate on the front and one plate on the rear.
B.  A person shall display all license plates as required by subsection A until their lawful use expires or is canceled or revoked. A person shall maintain each license plate so it is clearly legible. A person shall securely fasten each license plate to the vehicle as follows:
    1.  To prevent the plate from swinging.
    2.  At a height of at least twelve inches from the ground to the bottom of the plate.
    3.  In a position to be clearly visible.

The government argues that Officer Oetter had an objectively reasonable basis for believing a traffic offense had occurred. Any mistake of fact or mistake of law on his part, therefore, does not affect the validity of the traffic stop.

Within the Eighth Circuit,

> the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry. As we held in *United States v. Sanders*, 196 F.3d 910, 913 & n.3 (8th Cir. 1999), the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one. "The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* at 913.

*United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005).

The Nebraska statutory expression requiring proper display of plates "logically implies a display which is visible." *State v. Reiter*, 524 N.W.2d 575, 578 (Neb. Ct. App.), *review overruled* (1994) (applying Neb. Rev. Stat. §§ 60-302 and 60-320 *et seq*.). In this case, Oetter was initially unable to tell where defendant's license plate originated (6:9-12), as the name of the state was completely obscured. While he eventually recognized the plate as an Arizona plate, he was not able to make that determination until he was one or two car lengths away from defendant's vehicle.

The officer also testified credibly as to his belief that the plate violated a Nebraska law requiring that all letters, numerals and markings on a license plate be clear, visible and readable, that he was unaware of Arizona law about the display of plates, but he was aware

-9-

that other states have laws similar to Nebraska.  Furthermore, even assuming that the officer was aware of Neb. Rev. Stat. § 60-328, that statute contains what appears to be a "reciprocity" provision that the statute applies to a nonresident's vehicle "only to the extent that under the laws of the foreign [state] of his or her residence, like exemptions and privileges are guaranteed to motor vehicles duly registered under the laws of and owned by residents of this state."  The court has been unable to identify any such Arizona statute or law.

Considering all these circumstances, I find that Officer Oetter's action in stopping defendant's vehicle for a violation of Neb. Rev. Stat. § 60-324 was objectively reasonable. If he made a mistake of fact or law in this instance, the mistake was an objectively reasonable one.

### C.     Search of the Vehicle

Defendant contends he did not voluntarily consent to the search of his vehicle due to the "lack of effective communication" between him and Officer Oetter; in other words, he did not understand the officer's request to search.

"Police may conduct a search of someone's home or person even without a warrant or probable cause if that person voluntarily consents to the search.  *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)."  *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *see also United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the

circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 982 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).

Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include:
> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.
>
> *Id.* at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:
> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.
>
> *Id.* (internal citations omitted). The factors should not be applied mechanically, *id.*, and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

The conversation between Officer Oetter and the defendant was recorded on videotape (Ex. 3). The court has reviewed the videotape, which shows the officer and the defendant communicating well in a blend of Spanish and English. The videotape tends to corroborate Officer Oetter's testimony and does not demonstrate that the defendant was having any problems understanding the officer or what was going on during the contact. The consent form (Ex. 1) signed by the defendant was a Spanish language form. The defendant appeared to be able to read the form. Considering the *Chaidez* factors in conjunction with the defendant's written consent to search, the videotape, and the hearing testimony, I find that defendant voluntarily consented to the search of his vehicle.

### D.   Statements

Defendant contends the statement he made after his arrest should be suppressed because the statement was the direct result of the violation of his Fourth Amendment rights. Because I find that defendant's Fourth Amendment rights were not violated, I recommend that the motion to suppress be denied as to the defendant's statements.

### RECOMMENDATION

In summary, the defendant had a reasonable expectation of privacy in the vehicle he was driving. The arresting officer had an objectively reasonable basis for believing a traffic offense had occurred, and the traffic stop did not violate the defendant's Fourth Amendment rights. The defendant voluntarily consented to the search of the vehicle. Defendant's subsequent statements were not the result of Fourth Amendment violations.

For these reasons,

**IT IS RECOMMENDED** that the Motion to Suppress (#11) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED June 8, 2005.**

       **BY THE COURT:**

       **s/ F.A. Gossett**
       **United States Magistrate Judge**